IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

MARTHA FIELDER,                          )
                                         )
                Plaintiff,               )
                                         )
vs.                                      )
                                         )    Case No. 02-CV-473-GKF-PJC
UNUM LIFE INSURANCE COMPANY OF           )
AMERICA, INC.,                           )
                                         )
                Defendant.               )

## O P I N I O N  A N D  O R D E R

Plaintiff Martha Fielder ("Fielder") filed this action seeking to recover benefits and enforce her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 *et seq.* ("ERISA"). Fielder challenges the decision of defendant UNUM Life Insurance Company of America, Inc. ("UNUM") to deny long-term disability benefits.

I.    Background

Fielder was employed by Integris Baptist Health Pawnee Municipal Hospital as a certified respiratory therapist and a purchasing manager. [R. at 59]. Fielder alleges that beginning August 24, 1999, she was unable to fully perform the functions of her job due to symptoms related to chronic progressive multiple sclerosis ("MS"). [R. at 61-63]. Fielder was pre-approved for UNUM disability benefits on December 16, 1999. [R. at 79].

By letter dated April 2, 2001, Fielder was informed of UNUM's decision to discontinue her benefits. [R. at 171].

> Based on our review of your medical records, we have determined that it is reasonable that you would be limited from heavy or repetitive lifting and bending.  We are in agreement with your attending physician, Dr. J. Johnson, that you could stand at least 2 hours and probably 3 - 4 hours at a time with rests every 2 - 3 hours. These restrictions and limitations, however, would not preclude you

from performing the duties of your occupation as a Respiratory Therapist/Purchasing Supervisor.  As such, we must deny further liability on your claim as of March 29, 2001.

[R. at 171].

Fielder appealed the UNUM decision by letter dated May 9, 2001. [R. at 175].  UNUM reviewed the additional medical reports and records Fielder submitted in support of her position that she was unable to perform the physical requirements of her job, and by letter dated August 15, 2001[1] upheld the denial of her claim for long-term disability benefits. [R. at 244-46].

II.     Standard of Review and Consideration of the Record

The standard of review in an ERISA case is *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan administrator is given discretion, the court applies an arbitrary and capricious standard in reviewing the decision of the plan administrator.  *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998).  "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'"  *Firestone*, 489 U.S. at 115 (1989) (citation omitted).

In reviewing the decision of an administrator operating under a conflict of interest, the court applies a two-tiered "sliding scale."  *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1004 -07 (10th Cir. 2004); *Sumner v. Continental Casualty Co.*, 2006 WL 770632 at * 5 (N. D. Okla. March 23, 2006).  The arbitrary and capricious standard is "inherently flexible," with the degree of

---

[1]  Plaintiff contends the letter was incorrectly dated and that it was actually written and sent on October 18, 2001.  [Docket No. 21, p. 19].  Defendant agrees.  [Docket No. 22, p. 15].

deference "decreased on a sliding scale in proportion to the extent of conflict. . . ."  *McGraw v. Prudential Ins. Co. of America.*, 137 F.3d 1253, 1258 (10th Cir. 1998).  When a plaintiff cannot establish a serious conflict, the conflict of interest is viewed as "one factor in determining whether the plan administrator's denial of benefits was arbitrary and capricious."  *Fought*, 379 F.3d at 1005.  When an inherent conflict of interest exists, "the burden is on the fiduciary to establish by substantial evidence that the denial of benefits was not arbitrary and capricious."  *Fought*, 379 F.3d at 1005.

> When the plan administrator operates under either (1) an inherent conflict of interest, Kennedy, *Judicial Standard*, 50 Am. U.L. Rev. at 1173; *see also Pitman*, 217 F.3d at 1296 n.4 (noting that "as both insurer and administrator of the plan, there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound"); (2) a proven conflict of interest; or (3) when a serious procedural irregularity exists, and the plan administrator has denied coverage, an additional reduction in deference is appropriate. Under this less deferential standard, the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard.

*Fought*, 379 F.3d at 1006.  The inquiry for the court is whether the plan administrator's decision is supported by substantial evidence.  "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].'  Substantial evidence requires 'more than a scintilla but less than a preponderance.'"  *Sandoval v. Aetna life & Ca. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (citations omitted).  In an inherent conflict situation, the court "must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest."  *Allison v. UNUM Life Ins. Co. of America*, 381 F.3d 1015, 1022 (10th Cir. 1992).

3

In reviewing the decision of the plan administrator, the court is "limited to the 'administrative record' – the materials compiled by the administrator in the course of making his decision."  *Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1201 (10th Cir. 2002).   In determining whether the plan administrator considered a particular rationale, the court "look[s] only to those rationales that were specifically articulated in the administrative record as the basis for denying a claim."  *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007).

In this case, the plan gives discretionary authority to the administrator of the plan to determine an employee's eligibility for benefits and to construe the terms of the plan. [R. at 324]. UNUM was operating under an inherent conflict of interest in its dual role as plan administrator and insurer.  Further, the parties agree that the burden shifting analysis articulated in *Fought* applies. [Docket No. 34, at 7; Docket No. 36 at 1].  The Court therefore applies that analysis.[2]

---

[2]      In *Adamson v. Unum Life Ins. Co. of America*, 455 F.3d 1209 (10th Cir. 2006), the Tenth Circuit Court of Appeals mentioned inherent conflicts.

> [W]here an insurer doubles as the plan administrator, we have enunciated that 'there is an inherent conflict of interest between its discretion in paying claims and the need to stay financially sound.'  It might be just as easily observed that an insurer has an incentive to pay claims and to get it right so as to avoid dissatisfaction (from plans as customers) and lawsuits.  Whatever the merits concerning the potential motivation of an insurer doubling as a plan administrator, such observations were never meant to be an *ipso facto* conclusive presumption to be applied without regard to the facts of the case – including the solvency of the insurer or the nature or size of the claim.

*Adamson*, 455 F.3d at 1213.  The Court concludes that *Fought* applies the appropriate standard of review in this case.  *See, e.g., Panther v. Sun Life Assur. Co. of Canada*, 464 F. Supp. 2d 1116, 1121 (D. Kan. 2006) ("The court has reviewed the *Adamson* decision and finds it a unique modification based on the specific circumstances of that case.  Because *Adamson* does not overrule *Fought*, it must be read in harmony with *Fought*.  Accordingly, the court concludes that the rationale in *Adamson* applies in the rare circumstance when the inherent conflict of interest is merely nominal, and does not involve exercising judgment regarding the grant or denial of benefits.").  *See also Johnson v. Liberty Life Assurance Co. of Boston*, 2008 WL 268290 at *4 (10th Cir. Jan. 31, 2008) ("As both administrator and insurer of the Plan, Liberty Life operates under an inherent conflict of interest.").

III.    Review

The Court has throughly reviewed the administrative record and concludes that the plan administrator's decision must be reversed and remanded because it is not supported by substantial evidence.

As previously stated, Fielder contends she is physically unable to perform the physical requirements of her job.  The administrative record contains three vocational or occupational assessments of the physical requirements of Fielder's prior work.  Each of the three assessments acknowledges a lifting requirement of between 30 and up to 50 pounds.

In November of 1999, Fielder's employer completed a Job Analyis form supplied by UNUM. On the form, "occasionally means the person does the activity up to 33% of the time;" "frequently means the person does the activity 34% to 66% of the time;" and "continuously means the person does the activity 67% to 100% of the time." [R. at 59].  Fielder's job as manager of respiratory therapy and purchasing, which required certification as a respiratory therapist, is described as: "continuously" requiring walking, standing, reaching overhead, pushing, pulling, and lifting/carrying; "frequently" requiring balancing, stooping, and kneeling, and "occasionally" requiring sitting and crouching.  [R. at 59].  The job required pushing and pulling patient beds and equipment of thirty pounds "continuously," and lifting/carrying supplies weighing from ten to thirty pounds "continuously."  [R. at 58-59].

UNUM conducted an occupational analysis of Fielder's job functions and produced a report dated March 28, 2001.  [R. at 166-68].  The physical demands of Fielder's job requirements were described as "Medium Work" requiring lifting 20 - 50 pounds occasionally, 10 to 25 pounds frequently, and up to 10 pounds constantly.  [R. at 167].  "Occasionally" was defined as 0 - 2.5

5

hours/day; "frequently" was defined as 2.5 - 5.5 hours/day; and "constantly" was defined as 5.5 + hours per day. [R. at 167].  The analysis states that stooping was occasionally required, with reaching, handling, and fingering frequently required. [R. at 166].  The occupational analysis concluded that Fielder "would be capable of performing the functions of her occupation."  [R. at 166].

UNUM had an additional occupational analysis conducted, which culminated in a written report dated October 3, 2001. [R. at 208- 242].  The vocational consultant concluded that the occupation of respiratory therapist was classified as Medium Work requiring lifting, carrying, pushing and pulling of 20 to 50 pounds occasionally, 10 to 25 pounds frequently, and up to 10 pounds constantly. [R. at 226, 234, 240].  The job required occasional stooping and frequent reaching.  [R. at 226].  The job of "Manager, Procurement Services" was listed as Sedentary Work requiring lifting, carrying, pushing and pulling of 10 pounds occasionally.  [R. at 220].  Fielder's employer stated that Fielder performed the duties of a purchasing manager approximately ten to fifteen percent of the time. [R. at 241].

Each of the three vocational assessments in the record describes Fielder's job as requiring the functional ability to lift up to 30 or 50 pounds.  Fielder's employer wrote that the job required lifting/carrying up to 30 pounds of supplies continuously (defined as 67 to 100% of the time).  The two UNUM job assessments specified that Fielder's job required occasional lifting (0 to 2.5 hours per day) of between 20 and 50 pounds.

The record contains assessments of Fielder's functional abilities by Fielder's doctor and by a doctor assigned by UNUM to do a medical file review.  However, neither doctor affirmatively

states that Fielder can lift between 30 and up to 50 pounds on either an occasional or continuous basis.

Fielder's treating physician, Jim Riemer, D.O., completed a UNUM "treating physician" form on November 10, 1999. [R. at 60-61]. Dr. Riemer noted symptoms of right leg weakness, partial paralysis, and unstable balance, with an objective finding of motor weakness of the right lower extremity, and a primary diagnosis of chronic progressive MS. According to Dr. Riemer, Fielder's symptoms first appeared in 1987, but her secondary conditions became worse as a result of walking and standing eight hours each day. [R. at 60-61]. Dr. Riemer described Fielder's restrictions (what she should not do) as bending, squatting, sitting, climbing, or standing more than two hours at a time. His prognosis for Fielder was "poor, guarded." [R. at 60].

Leslie Brucks, RN, visited Fielder on behalf of UNUM and submitted a written report dated January 24, 2001. [R. at 130-33]. Fielder wears a customized brace on her right leg, extending from the foot to the thigh. Fielder reported having good and bad days with her MS symptoms, and increased pain in her back. Fielder said she did small jobs for the hospital from time to time and occasionally worked for an ex-sister-in-law who owned a flower shop, but that the work was sporadic. [R. at 131-33]. Brucks also interviewed Dr. Reimer, who reported he believed Fielder could probably stand up to three or four hours at a time, but should avoid repetitive bending and stooping, and "no lifting greater than 20 - 25 pounds." [R. at 134]. Dr. Reimer said Fielder's walking was limited primarily due to her altered gait pattern from the MS. [R. at 134].

The functional restrictions noted in Brucks' reports are reflected in the administrative record in a referral by UNUM's April Owens to Brad Stuman, R.N., for a Clinical Review. Owens listed the current restrictions and limitations as no bending, squatting, climbing, standing, or sitting greater

than two hours at a time; "may be able to increase standing to 3 - 4 hrs"; avoiding repetitive stooping and bending, and no lifting greater than 20 - 25 pounds. [R. at 158].

UNUM then referred the file to Steven J. Feagin, M.D., and Feagin completed a written medical file review on March 21, 2001. [R. at 159 - 161]. Feagin concluded in part that the "[a]bsence of a definitive neurological diagnosis with multiple factors suggesting that this is not chronic progressive multiple sclerosis though this remains possible." [R. at 161]. Feagin wrote that "[o]ne is therefore left with a claimant who has worked with a chronic condition, which has not been objectively shown to have changed or progressed." [R. at 160]. "One would certainly expect the claimant to have difficulties with repeated kneeling, crouching, and squatting, but it is unlikely that she was previously doing this, in spite of the job analysis provided, given her described chronic baseline." [R. at 160]. Feagin noted Fielder's complaints of back pain, and concluded that it was "reasonable to limit the claimant from heavy or repetitive bending and lifting given the repeated flares of back discomfort in the setting of mechanical strain produced by the claimant's abnormal gait." [R. at 159]. Feagin does not detail Fielder's lifting limitations in his medical file review, but notes that the "records do not substantiate inability to lift 10 to 20 pounds frequently and up to 30 pounds occasionally." [R. at 159]. Feagin agreed that the treating physician's opinion – that Fielder could probably stand two hours and possibly three to four hours at a time – was reasonable. [R. at 159].

Because the record does not contain substantial evidence to support a conclusion that Fielder can perform the physical requirements of her job, this action must be remanded. As set forth above, Fielder's employer wrote that Fielder's job required her to lift up to 30 pounds continuously. Two UNUM vocational reviews list lifting requirements between 20 and 50 pounds occasionally. Dr.

8

Reimer reported that Fielder should lift no more than 20 - 25 pounds, and the doctor to whom UNUM referred the file for a medical file review did not specify how much Fielder could lift. No medical evidence supports a conclusion that Fielder can perform the lifting requirements of her occupation.

UNUM's remaining arguments are unavailing.  UNUM argues that Fielder did not have a definitive diagnosis of MS, but, at best, a "probable" diagnosis.  The specific medical diagnosis is not determinative[3] because the record does not support UNUM's conclusion that Fielder could perform the physical demands of her occupation.  UMUM contends that Fielder's condition had improved to the point that she was capable of performing the duties of her job.  Again, the record does not support a conclusion that Fielder could perform the lifting requirements of her occupation. UNUM's argument that Fielder's work at a flower shop and performance of light housework  shows that she can perform her occupational duties is unpersuasive.  Fielder worked two or three hours a day for two days a week at a flower shop, but was unable to continue the work.  [R. at 190].  The performance of such work does not support UNUM's conclusion that Fielder could perform the physical requirements of her occupation.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment is granted in part and denied in part [Docket No. 21]; plaintiff's claim is remanded for further evaluation and findings as to whether plaintiff is or was entitled to long-term disability benefits and from what date.

---

[3]     The record contains support for a diagnosis of either MS or an unspecified neurological impairment. Jay K. Johnson, D.O., indicated that he suspected plaintiff had chronic progressive MS but that he had no evidence to support his suspicion. Dr. Johnson also noted Fielder could have had "an episode of transverse myelitis" but that would not explain the progression of her symptoms.  "At this point I can only give a differential diagnosis. . . . [C]ertainly she has neurologic impairment that is unequivocal." [R. at 39].  Dr. Johnson also noted some disuse atrophy in Fielder's right leg which was noted as smaller than her left, and some gait irregularities. [R. at 48-49].  An MRI scan dated September 27, 1999, was interpreted as demonstrating "some periventricular areas of increased signal, primarily in the posteroparietal region, and a couple of small subcortical areas of increased signal."  The findings were noted as possibly age-related "versus secondary to small vessel disease versus demyelinating disease." [R. at 41, 119].

9

DATED this 31st day of March 2007.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma